**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF LOUISIANA**

DARIN ARCENEAUX

CIVIL ACTION

VERSUS

24-356-SDD-EWD

GREAT NORTHERN INSURANCE CO.,

# RULING

Before the Court is the *Motion for Summary Judgment*[1] filed by Defendant Great Northern Insurance Company ("Defendant" or "Great Northern"). Plaintiff Darin Arceneaux ("Plaintiff" or "Arceneaux") filed an *Opposition*,[2] to which Great Northern filed a *Reply*.[3] The Court has carefully considered the parties' submissions, arguments, and applicable law, and is prepared to rule. For the reasons that follow, Great Northern's *Motion* will be GRANTED and Plaintiff's claims are DISMISSED with prejudice.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This case concerns an insurance coverage dispute over damages to the backyard patio of Plaintiff's residence at 19747 Southern Hills Avenue in Baton Rouge, Louisiana (the "Property"), which he attributes to muriatic acid treatments applied to the brick and flagstone surfaces by contractors in October 2023 (the "muriatic acid treatments"). Plaintiff filed a claim under his homeowner's insurance policy, which was issued by Great Northern for the period of June 2, 2023 through October 16, 2023 (the "Policy").[4] The claim was denied and this lawsuit initiated soon thereafter. The following facts are

[1] Rec. Doc. No. 41.
[2] Rec. Doc. No. 48.
[3] Rec. Doc. No. 49.
[4] *See* Rec. Doc. No. 41-4, p. 1 (stating policy "effective date" of 6/2/23); Rec. Doc. No. 41-13, p. 1 (stating policy was "canceled by insured" on "October 16, 2023").

undisputed except where noted.

On June 17, 2023, Plaintiff retained Eduardo J. Jenkins, Landscape Architect and Planner, LLC ("EJLAP"), to perform repairs to his backyard fountain and surrounding pool deck (collectively, the "Patio").[5] Relevant here, the repairs included "regrout[ing] the pool deck in its entirety"[6]—a task which was performed by EJLAP's subcontractor, Gregory Harrison ("Harrison"), in late September 2023.[7] During the regrouting process, an excessive amount of resin-based grout was spread over the Patio's brick and flagstone surfaces, causing damage as it hardened.[8] Plaintiff testified at his deposition that he "called into question" the faulty re-grouting in "early October," instructing EJLAP to halt the project" and "[g]et this stuff off."[9] Soon thereafter, Harrison attempted to remove the excess grout and remediate any damage by repeatedly applying muriatic acid treatments and high pressure water washes to the affected areas.[10]

Due to several improper applications,[11] however, the muriatic acid treatments resulted in a chemical discoloration of the Patio's stone surfaces.[12] The parties dispute both the timing[13] and extent[14] of Plaintiff's complained of damages. In any event, Plaintiff

---

[5] Rec. Doc. No. 41-10, p. 3.
[6] Rec. Doc. No. 41-10, p. 2.
[7] Rec. Doc. No. 41-6, pp. 2, 11.
[8] *See* Rec. Doc. No. 1, ¶ 13; Rec. Doc. No. 41-9, p. 1.
[9] Rec. Doc. No. 41-5, p. 79
[10] *Id*; Rec. Doc. No 41-7, p. 6; Rec. Doc. No. 41-9, p. 1.
[11] Rec. Doc. No. 41-5, p. 183:1-7 (stating the parties' agreement that the complained of damage was caused by improper application of the muriatic acid by "[EJLAP] and/or Greg Harrison"); Rec. Doc. No. 41-9, p.1.
[12] Rec. Doc. No. 41-5, pp. 85-86; Rec. Doc. No. 41-6, pp. 2-3; Rec. Doc. No. 49-1, p. 1.
[13] Plaintiff's first documented communication identifying damage was an October 22 text message to Linda Jenkins, the wife of Eduardo Jenkins. Rec. Doc. No. 41-11, p. 29. Plaintiff's sworn deposition testimony, however, represents that he first noticed discoloration and changed "physical properties of the stone" in "early October." Rec. Doc. No. 41-5, p. 85:5-11; *see* Rec. Doc. No. 48 (stating Plaintiff's position that he first observed acid discoloration before October 16, 2023—the Policy's cancellation date). Further, he contends that "[t]he acid damage was chemically and physically occurring from the moment of application." Rec. Doc. No. 48-1, p. 4.
[14] Plaintiff identified numerous cracks on the Patio bricks which he attributes to over-exposure to muriatic acid. Rec. Doc. No 41-1, p. 6; *see* Rec. Doc. No. 41-6, p. 2 ("damage to the property consisted of chemical deterioration and discoloration"). Great Northern's investigation, however, attributed the "cracks noted in

contacted EJLAP as early as October 22, 2023, to report discoloration "in quite a few places" where excess grout had been removed.[15] On October 30, Plaintiff contacted EJLAP to inform them that "the flagstone is permanently stained" and must be replaced, instructing the company to "file a claim with your insurer."[16] It became clear on November 7, however, that EJLAP was not covered by a professional liability insurance policy[17] and did not have the means to pay the damages.[18]

Plaintiff filed a notice of claim with Great Northern on November 21, 2023, for the "permanently damaged … flagstone and brick," which he attributed to EJLAP's "inappropriately applying … mortar with strengthening resin over the entire service area" and "applying muriatic acid … and letting it sit … for longer than the manufacturer's application instructions."[19] On December 8, 2023, Great Northern assigned Timothy B. Hassenboehler ("Hassenboehler'), a professional engineer employed by EFI Global, to inspect the Patio.[20] An on-site inspection took place on December 12,[21] during which Plaintiff informed Hassenboehler of the muriatic acid treatments.[22] Hassenboehler's subsequent damage assessment concluded the Patio had been "damaged in a manner consistent with improper use of a cleaning agent … such as muriatic acid."[23] Following the damage assessment's issuance, the parties attempted to address Plaintiff's concern that Hassenboehler lacked necessary qualifications and issued erroneous findings

---

the masonry brick pavers … to natural phenomenon of masonry brick [which] existed prior to the reported installation of … the acidic material." Rec. Doc. No. 41-16, p. 6.
[15] Rec. Doc. No. 41-11, p. 29.
[16] Rec. Doc. No. 41-11, p. 87.
[17] *Id.* at pp. 94-95.
[18] Rec. Doc. No. 41-5, p. 111:19-23.
[19] Rec. Doc. No. 41-13, pp. 1-2.
[20] Rec. Doc. No. 41-14, p. 2
[21] *Id.*
[22] Rec. Doc. No. 41-5, p. 122:8-10.
[23] Rec. Doc. No. 41-14, at pp. 6-7.

regarding the scope and extent of the claimed damages.[24] The disputed findings did not relate to the cause of the claimed damages.[25]

On February 12, 2024, Plaintiff's claim was denied by Great Northern.[26] The denial letter explained, in relevant part, that Plaintiff's claimed damages were determined to be the result of "workmanship" and therefore subject to the Policy's coverage exclusion for "[f]aulty planning, construction, or maintenance" (the "faulty workmanship exclusion").[27] The exclusion provides, in full:

> **Faulty planning, construction or maintenance**. We do not cover any loss caused by the faulty acts, errors or omissions of you or any other person in planning, construction or maintenance. It does not matter whether the faulty acts, errors or omissions take place on or off the insured property. But we do insure ensuing covered loss unless another exclusion applies. "Planning" includes zoning, placing, surveying, designing, compacting, setting specifications, developing property and establishing building codes or construction standards. "Construction" includes materials, workmanship, and parts or equipment used for construction or repair.[28]

On May 6, 2024, Plaintiff filed this lawsuit asserting a breach of contract based on Great Northern's failure "to accept coverage to [Plaintiff] for losses resulting from [EJLAP's] actions in breach of the Policy."[29] Plaintiff further asserts a bad faith claim under La. R.S. §§ 22:1973 and 1892 for Great Northern's "arbitrary and capricious failure to pay [his] claim without a reasonable basis to do so."[30] Accordingly, Plaintiff seeks (i) declaratory judgment that Great Northern is obligated to accept coverage under the Policy for damages caused to the Property's stone and masonry by EJLAP's use of muriatic

[24] Rec. Doc. No. 41-15, p. 1; Rec. Doc. No. 41-5, p. 137:19-22.
[25] Rec. Doc. No. 41-5, p. 183:1-7.
[26] Rec. Doc. No. 41-16.
[27] *Id.* at pp. 3-4.
[28] Rec. Doc. No. 41-4, p. 45.
[29] Rec. Doc. No. 1, ¶ 28.
[30] *Id.* at ¶ 31.

acid; (ii) compensatory damages, (iii) cost of proceedings; (iv) bad faith penalties; (v) pre-judgment and post-judgment interest; (vi) attorney's fees; and (vii) equitable relief.[31]

## II. LEGAL STANDARD

In reviewing a party's motion for summary judgment, the Court will grant the motion if (1) there is no genuine issue of material fact, and (2) the mover is entitled to judgment as a matter of law.[32] This determination is made "in the light most favorable to the opposing party."[33] "When seeking summary judgment, the movant bears the initial responsibility of demonstrating the absence of a genuine issue of material fact with respect to those issues on which the movant bears the burden of proof at trial."[34] If the moving party satisfies its burden, "the non-movant must respond to the motion for summary judgment by setting forth particular facts indicating that there is a genuine issue for trial."[35] However, the non-moving party's burden "'is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'"[36]

Notably, "[a] genuine issue of material fact exists, 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"[37] All reasonable factual inferences are drawn in favor of the nonmoving party.[38] That said, conclusional

[31] *Id.* at pp. 4-5.
[32] Fed. R. Civ. P. 56(a).
[33] *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).
[34] *Transamerica Ins. Co. v. Avenell*, 66 F.3d 715, 718 (5th Cir. 1995) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 333–34 (1986)).
[35] *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 424 (5th Cir. 2000) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986)).
[36] *Willis v. Roche Biomedical Lab., Inc.,* 61 F.3d 313, 315 (5th Cir. 1995) (quoting *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994)).
[37] *Pylant v. Hartford Life and Accident Ins. Co.*, 497 F.3d 536, 538 (5th Cir. 2007) (quoting *Anderson*, 477 U.S. at 248)).
[38] *Galindo v. Precision Am. Corp*., 754 F.2d 1212, 1216 (5th Cir. 1985) (citing *Hodges v. Exxon Corp.*, 727 F.2d 450, 452 (5th Cir. 1984)).

allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial.[39]

## III. LAW AND ANALYSIS

Great Northern now seeks summary judgment of Plaintiff's contractual claim on several grounds. First, Great Northern argues that the Policy bars coverage of Plaintiff's claimed damages because they were caused by his contractor's faulty workmanship, which is an excluded cause of loss.[40] Second, and in the alternative, it argues the Policy bars coverage of Plaintiff's claimed damages to the extent they were caused by the "intentional acts" of his contractor."[41] In support of this argument, Great Northern points to the Policy exclusion for damages "caused intentionally by a person directed by" the insured.[42] Third, Great Northern argues that Plaintiff's claims are not cognizable under the Policy, as a general matter, because any complained of muriatic acid damage occurred after Plaintiff had cancelled the Policy on October 16, 2023, for reasons unrelated to this action.[43]

Great Northern next argues that Plaintiff's alleged bad faith claims must "fail as a matter of law because there is no valid, underlying claim, upon which to state a [] claim" under either La. R.S. §§ 22:1973 or 1892.[44] Alternatively, Great Northern contends that even if a valid contractual claim is found to exist, Louisiana law does not provide for bad faith penalties where an insurer "has a reasonable basis to defend [a] claim and acts in

---

[39] *TIG Ins. Co. v. Sedgwick James of Washington*, 276 F.3d 754, 759 (5th Cir. 2002) (citing *SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1993)).
[40] Rec. Doc. No. 41-1, p. 11.
[41] *Id.* at p. 14.
[42] *Id.* (citing Rec, Doc. No. 41-4, p. 45).
[43] *Id.* at p. 16.
[44] *Id.* at p. 18.

good-faith reliance on that defense."[45] Because it has provided evidence that the sued upon damages were caused by a contractor's "faulty application of muriatic acid," Great Northern contends it has a reasonable basis to dispute Plaintiff's claim under the Policy and any bad faith claim should be dismissed accordingly.[46]

A procedural point is appropriate here. The arguments in Plaintiff's *Motion for Partial Summary Judgment on Ensuing Loss* ("Plaintiff's *Partial Motion*")[47] overlap substantially with those in its response to Great Northern's *Motion for Summary Judgment* on Plaintiff's contractual claim. Plaintiff's *Opposition* therefore directs the Court to his "affirmative motion [which] explains in detail why the ensuing loss provision restores coverage for the acid damage" to the Patio.[48] Consequently, Great Northern's *Reply* adopts by reference its opposition to Plaintiff's *Partial Motion*.[49] Given the interrelated nature of the *Motions* and common issues involved in their disposition, the Court will consider them and their corresponding arguments concurrently.[50]

A. <u>Contractual Claims</u>

Under Louisiana law, "an insurance policy is a contract between the parties and should be construed by using the general rules of interpretation on contracts set forth in the Louisiana Civil Code.[51] With respect to coverage, the insured bears the burden of proving that the incident giving rise to a claim falls within a policy's terms.[52] However,

[45] *Id.* at p. 19 (citing *Reed v. State Farm Mut. Auto. Ins. Co.*, 857 So. 2d 1012, 1021 (La. 2003).
[46] *Id* at pp. 19-22.
[47] Rec. Doc. No. 40.
[48] Rec. Doc. No. 48, p. 7 (referencing and summarizing arguments in Rec. Doc. No. 40-1).
[49] Rec. Doc. No. 49, p 2 (adopting by reference arguments in Rec. Doc. No. 46).
[50] *Tesoro Ref. & Mktg. Co. LLC v. Nat'l Union Fire Ins. Co. of Pittsburgh, Penn.*, 96 F. Supp. 3d 638, 644 (W.D. Tex. 2015), *aff'd*, 833 F.3d 470 (5th Cir. 2016).
[51] *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 206 (5th Cir. 2007) (quoting *Cadwallader v. Allstate Ins. Co.*, 848 So.2d 577, 50 (La. 2003)).
[52] *Illinois Union Ins. Co. v. La. Health Service and Indem. Co.*, 257 F. Supp. 3d 763, 786 (E.D. La. 2017).

"the insurer bears the burden of proving the applicability of an exclusionary clause within the policy."[53] "Exclusionary provisions must be read together with the entire policy and are construed strictly against the insurer and in favor of coverage."[54] "When the words of an insurance contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent and courts must enforce the contract as written."[55] But, "[i]f the language of the exclusion is subject to two or more reasonable interpretations, the interpretation which favors coverage must be applied."[56] Thus, "[a] summary judgment declaring a lack of coverage under an insurance policy may not be rendered unless no reasonable interpretation of the policy, when applied to the undisputed material facts shown by the evidence supporting the motion, exists under which coverage could be afforded."[57]

Invoking the faulty workmanship exclusion, Great Northern contends that the plain language of the Policy excludes "any loss caused by the faulty acts, errors, or omissions of [the insured] or any other person in planning, construction, or maintenance," including any construction "materials, workmanship, and parts or equipment used for construction or repair."[58] It argues that this language squarely applies to Plaintiff's coverage request "for damage to the brick and stone … caused by [EJLAP's] use and application of muriatic acid on the brick and stone."[59] Plaintiff responds that, although his claimed damage was caused by muriatic acid treatments improperly applied by his contractor, the faulty

---

[53] *Doerr v. Mobil Oil Corp.*, 774 So. 2d 119, 124 (La. 2004).
[54] *Illinois Urban Ins. Co.*, 257 F. Supp. 3d at 786 (citing *Garcia v. St. Bernard Parish Sch. Bd.*, 576 So.2d 975, 976 (La. 1991)).
[55] *Sims v. Mulhearn Funeral Home, Inc.*, 956 So.2d 583, 589 (La. 2007).
[56] *Illinois Urban Ins. Co.*, 257 F. Supp. 3d at 786 (quoting *Reynolds v. Select Props., Ltd.*, 634 So.2d 1180 (La. 1994)).
[57] *Widder v. La. Citizens Prop. Ins. Corp.*, 82 So.3d 294, 296 (La. App. 4 Cir. 2011).
[58] Rec. Doc. No. 41-1, pp. 11-12.
[59] *Id.* at 10 (citing Rec. Doc. No. 41-7, pp. 7-8 (Plaintiff's Answer to Request for Admission No. 22)).

workmanship exclusion's carve-out for an "ensuing covered loss" applies to reinstate coverage.[60] Specifically, he argues that because the acid damage was "extraneous, though not entirely unrelated" to EJLAP's faulty regrouting work in late September, it is a downstream event that was sufficiently "different in kind" from the excluded loss (i.e., the excess grout) to constitute an ensuing loss therefrom.[61] In other words, Plaintiff argues that, though the acid damage was "caused by and related to the underlying [excess grout] defect," it is not "synonymous with same"—i.e., a worsening or manifestation of the original damage—and, thus, constitutes a distinct, second loss covered by the Policy's ensuing loss provision.[62]

At the outset, the Court notes that the Policy does not define "ensuing loss." Nor has the Louisiana Supreme Court addressed the meaning of an ensuing loss provision in an insurance policy. That said, Plaintiff directs the Court to *Holden v. Connex-Metalna*,[63] in which a federal district court in the Eastern District of Louisiana outlined several precepts for interpreting ensuing loss provisions. The Court stated,

> First, the damage that falls under the exclusion and the ensuing damage must be separable events in that the damage and the ensuing loss must be different in kind, not just degree. Second[,] the mere fact that an excluded act or event is the 'but for' cause of the ensuing loss does not necessarily preclude coverage for the ensuing loss. Third, catastrophic damages to a machine caused by its own mechanical breakdown may be considered 'ensuing loss.' Finally, courts distinguish between damages arising from faulty workmanship during the construction process itself, and damages primarily caused by events extraneous to the construction process.[64]

---

[60] Rec. Doc. No. 48, p. 7.
[61] Rec. Doc. No. 40-1, at p. 11.
[62] Rec Doc. No. 40-1, pp. 11-12. Plaintiff contrasts grout damage, which he describes as "mechanical," with acid damage, which he notes is "chemical"—he explains that the two types of damage therefore "operate on different physical principle and present as qualitatively different []: one adds material to the stone; the other removes and transforms [its] surfaces." *Id* at p. 10.
[63] 2000 WL 1876338 (E.D. La. Dec. 21, 2000).
[64] *Id* at *6 (internal citations omitted).

The *Holden* court went on to hold that, although damage to the trolley and boom of a crane was excluded under a faulty workmanship exclusion, the loss of the crane when it plunged into the Mississippi river during an overload test was the result of an extraneous event, though not entirely unrelated to the workmanship defect; it was therefore an ensuing covered loss.[65] Plaintiff also directs the Court to *Dawson Farm, LLC v. Millers Mutual Fire Insurance Co.*,[66] in which a Louisiana appellate court held the cost to repair a refrigerated warehouse was excluded from coverage under a faulty workmanship exclusion, but the loss of sweet potatoes stored in the warehouse was covered as an ensuing loss.[67] The Court reasoned that the loss of sweet potatoes constituted a "second accident" that occurred when an "accumulation of condensation fell on the stored potatoes."[68] Plaintiff thus compares the prolonged muriatic acid saturation to the "crane pitching into the river" in *Holden* and the accumulation of condensation in *Dawson Farms*—describing it as "a distinct physical event, caused by and related to the underlying defect[,] but separable from it." [69]

Importantly, neither *Holden* nor *Dawson Farms* involved a claim for damages caused by a contractor's on-site efforts to repair its own faulty workmanship, especially before completion of the construction project. In such circumstances, the Court must consider whether Plaintiff is seeking to make "a single phenomenon that is clearly an excluded risk … compensable because in a philosophical sense" multiple steps were

---

[65] *Id* at *8.
[66] 794 So.2d 949 (La. App. 2 Cir. 2001).
[67] *In re Chinese Manufactured Drywall Prods. Liab. Litig.*, 759 F. Supp. 2d 822, 849 (E.D. La. 2010) (describing holding of *Dawson Farms*).
[68] *Dawson Farms*, at 952-53 (cleaned up).
[69] Rec. Doc. No. 40-1, p. 12.

taken during the construction process before a concomitant sued-upon damage materialized.[70] Great Northern contends that is the case, here, as EJLAP's faulty grouting and faulty acid treatments were two steps in a single phenomenon—the construction process to properly re-grout the Patio.[71] Plaintiff, however, argues that the multi-week muriatic treatments were "the response to a failure of the construction process, not a part of it."[72]

The Court disagrees. Even viewing the evidence in the light most favorable to Plaintiff, the acid damage to the Patio was not caused by events "extraneous" to the construction process. Instructively, in describing "a fortuitous event extraneous to the construction process, so as not to be within [a] faulty workmanship exclusion[,]" the Fifth Circuit provided the example of damage caused when "one of the insured's employees negligently ran a truck into [a] tower under construction and caused it to turn over."[73] Another example involved "damage incurred when wooden arches blew down in a strong wind, following [a] contractor's negligent installation."[74] Here, by contrast, the muriatic acid treatments—although not anticipated at the time construction commenced—had become an "integral part" of the construction process; it was deemed necessary, and planned, to remove excess grout and deliver the Patio that Plaintiff had contracted for.[75]

---

[70] *Aetna Cas. & Sur. Co. v. Yates*, 344 F.2d 939, 941 (5th Cir. 1965).
[71] Rec. Doc. No. 46, p. 17.
[72] Rec. Doc. No. 51, p. 8.
[73] *U.S. Industries, Inc. v. Aetna Cas. & Sur. Co.*, 690 F.2d 459, 461-62 (5th Cir. 1982).
[74] *Alton Ochsner Medical Found. v. Allendale Mut. Ins. Co.*, 219 F.3d 501, 507 (5th Cir. 2000) (citing *City of Barre v. New Hamshire Ins. Co.*, 136 Vt. 484 (1978).
[75] *Aetna Cas. & Sur. Co.*, 690 F.2d at 461; *See* Rec. Doc. No. 41-10, p. 2 (the contract specifically provided that the pool deck will be re-grouted "in its entirety as to match" and not "look like it had been patched or repaired"); *see also* Rec. Doc. No. 41-9, p. 1 (Greg Harrison stating "I had my workers return … and repeatedly apply muriatic acid and high pressure water … I know from my many years of experience within this trade that the use of muriatic acid and pressure washing is an appropriate method to repair damage caused by hardened grout, i.e., to remove the hardened grout.").

As such, Plaintiff's suggestion that "[t]he acid saturation was not part of building anything" is without merit;[76] before the muriatic acid treatments, the contracted for re-grouting had not been delivered and, thus, the Patio construction was incomplete.[77]

To the extent Plaintiff recognizes the excess grout was the result of faulty workmanship, and thus excluded by the Policy,[78] subsequent "repair efforts [(i.e., the muriatic acid treatments)] cannot be separated from the injury which gave rise to the[ir] attempt[]."[79] This is especially true where the efforts commenced almost immediately following the defect's discovery by the same individuals responsible for its occurrence, and, tellingly, before the construction project's overall completion.[80] The Court therefore concludes that EJLAP's faulty regrouting and muriatic acid treatments were part of a single phenomenon of faulty workmanship that was neither fortuitous[81] nor extraneous to the construction process, and which came together to culminate in the sued upon damage to the Patio's stone surfaces. Thus, it was not an ensuing loss.

The Court's conclusion comports with the general principle that "an insurance contract is not to be given a strained, forced, or unreasonable interpretation, but [rather] a fair, reasonable, and sensible construction compatible with the apparent object and plain intention of the parties as expressed in the words of the agreement."[82] Plaintiff's

---

[76] Rec. Doc. No. 40-1, p. 13.
[77] To the extent something is "integral" where it is "essential to completeness," the purpose of the muriatic acid treatments fits neatly into this definition. Integral, *Merriam Webster Dictionary* (12 ed. 2025)
[78] Rec. Doc. No. 48, p. 1 ("The damage from the contractor's original error, covering the brick with excess grout, is excluded.").
[79] *Carpenter Plastering Co. v. Puritan Ins. Co.*, 1988 WL 156829, at *4 n.1 (N.D. Tex. Aug. 23, 1988).
[80] Rec. Doc. No. 41-5, p. 79 ("Q: So once you raised the issue, [EJLAP] had his guys go try to remedy it right away? A: Yes.").
[81] The evidence reveals that the muriatic acid treatments were a deliberately chosen and planned method by which EJLAP sought to remove the excess grout. *See* Rec. Doc. No. 41-9, p. 1. Thus, any resulting damage cannot be said to have been the result of a "fortuitous" occurrence, which is understood to mean "occurring by chance." Fortuitous, *Merriam Webster Dictionary* (12 ed. 2025).
[82] *Gulf Bldg. Servs, Inc. v. Travelers Indem. Co.*, 435 So.2d 477, 478 (La. App. 4th Cir. 1983).

Policy clearly and unambiguously provides that it "do[es] not cover any loss caused by faulty acts … of [the insured] or any other person in … construction[,]" a term which encompasses both "workmanship" and "repair."[83] Such language is understood "to keep the insurer in its proper role as a bearer of casualties rather than as a warrantor" of an insured's contractors.[84] Applying Plaintiff's desired interpretation of the "ensuing covered loss" exception, however, would extend coverage any time an unanticipated event during the construction process prompts an on-the-job repair effort which inadvertently causes an additional, distinct kind of damage. It is axiomatic that construction-site errors and subsequent repair efforts are not *extraneous* to the construction process in the way that a negligently driven truck,[85] strong winds,[86] accumulated condensation,[87] or a crane overload test[88] are.

The Court therefore concludes that the damage resulting from the muriatic acid treatments was not an ensuing loss from the excess grout that was applied in late September. Rather, based on the undisputed facts, both the faulty grouting and faulty muriatic acid treatments were part and parcel the construction process to ensure Plaintiff's Patio was re-grouted in the manner provided for in the construction contract. As such, EJLAP's "faulty acts" and "errors" in applying the muriatic acid treatment during "construction" of the Patio fits neatly within the Policy's exclusion for damages caused by "workmanship."[89] Summary judgment on the issue of Policy coverage is thus warranted

---

[83] Rec. Doc. No. 41-4, p. 45.
[84] *Lake Charles Harbor & Terminal Dist. v. Imperial Cas. and Indem. Co.*, 670 F. Supp. 189, 194 (W.D. La. 1987).
[85] *Aetna Cas. & Sur. Co.*, 690 F.2d at 461-62.
[86] *Alton Ochsner Medical Found.*, 219 F.3d at 507.
[87] *Dawson Farms LLC*, 794 So.2d at 949.
[88] *Holden*, 2000 WL 1876338, at *9.
[89] Rec. Doc. No. 41-4, p. 45.

in Great Northern's favor and Plaintiff's contractual claim is DISMISSED with prejudice.[90]

B. Bad Faith Claims

Under Louisiana law, if an insured's breach of contract claim fails, so too must their bad faith claim.[91] "This is so because if there is no valid claim for breach of contract, then, logically, there can be no claim for bad faith breach of the contract."[92] As such, because there is no coverage under the Policy for damages caused to the Patio by EJLAP's faulty construction and repair efforts, Great Northern is likewise not liable on the bad faith claim and is entitled to judgment as a matter of law thereon.[93]

## IV. CONCLUSION

For the foregoing reasons, Great Northern's *Motion for Summary Judgment*[94] is GRANTED. Plaintiffs' contractual and bad faith claims are hereby DISMISSED with prejudice. Accordingly, Plaintiff's *Motion for Partial Summary Judgment on Ensuing Loss*[95] is DENIED AS MOOT.

**IT IS SO ORDERED.**

Baton Rouge, Louisiana, this 27 day of August, 2026.

**SHELLY D. DICK**
**CHIEF DISTRICT JUDGE**
**MIDDLE DISTRICT OF LOUISIANA**

[90] Because the Court is granting summary judgment on this basis, it need not reach the other arguments the parities raised in their briefing with respect to Plaintiff's contractual claim.
[91] *Johnson v. Am. Security Ins. Co.*, 650 F. Supp. 3d 483, 488 (E.D. La. 2023).
[92] *Id.* at n.34; *see Bradley v. Allstate Ins. Co.*, 620 F.3d 509, 525-26 (5th Cir. 2010) ("[A] plaintiff attempting to base her theory of recovery against an Insurer on [22:1892 and 22:1973] must first have a valid, underlying, substantive claim upon which Insurance coverage is based.").
[93] *See Clausen v. Fidelity and Deposit Co.*, 660 So.2d 83 (La. App. 1 Cir. 1995), *writ denied*, 666 So.2d 320 (La. 1986) (holding that statutory penalties and fees for bad faith claims handling are unavailable in cases where there is no underlying cause of action for failure to pay a legitimate claim.").
[94] Rec. Doc. No. 41.
[95] Rec. Doc. No. 40.